Syllabus.

## 𝔖𝔱𝔞𝔲𝔫𝔱𝔬𝔫.

### APPALACHIAN POWER COMPANY V. TOWN OF PULASKI.

#### September 22, 1921.

1. ELECTRIC LIGHT COMPANIES—*Ordinance Fixing Rates—Amendment.*—The municipal authorities and an electric light company can, by agreement, amend an ordinance granting a franchise to the company and fixing rates to be charged for light and power and reduce the maximum rate thereby authorized, and no further additional consideration to the company would be needed to support such an amendment other than the continuing privilege during the term of the ordinance to conduct its business thereunder.

2. ELECTRIC LIGHT COMPANIES—*Ordinance Fixing Rates—Amendment.*—If it were proposed to increase the rates which an electric light company was authorized by its charter to charge for service, it would be necessary to pursue the method prescribed by section 3022 of the Code of 1919, but the statute would not preclude a decrease of such rates by mutual agreement.

3. ELECTRIC LIGHT COMPANIES—*Rates—Alteration of Franchise—Case at Bar.*—By its franchise, an electric light company was entitled to charge a certain maximum rate for services. The company, through its local manager, applied to the council for permission to make certain changes in its rates, all within the maximum allowed by its franchise, and permission to do so was granted by an ordinance. It was clear that neither the high officials of the company, nor any other person authorized to act for the company, had the slightest intimation of a proposed rescission of the clause of the franchise fixing the maximum rate or any intention to consent to such rescission.

   *Held:* That the clause fixing the maximum rate was not rescinded by the ordinance granting permission to change the rates within the maximum and the rates so fixed substituted therefor.

4. ELECTRIC LIGHT COMPANIES—*Rates—Burden of Proof to Show Change of Rates—Case at Bar.*—Where a municipality claimed

that an ordinance granting a franchise to an electric light company and fixing maximum rates to be charged by the company had been rescinded and other rates fixed by a later ordinance, the burden of proof was upon the municipality to show that· the franchise contract has been thus amended.

5. ELECTRIC LIGHT COMPANIES—*Franchise Fixing Rates—Change of Rates—Mutual Consent—Case at Bar.*—Like other contracts, a franchise fixing a maximum rate to be charged by an electric light company cannot be amended without the consent of both contracting parties, and the intent of the city council, by ordinance or resolution, to change the rates, cannot operate to amend the contract except by agreement with the company; and in the instant case there was no evidence to show that the minds of the contracting parties ever met upon the alleged amendment to the franchise fixing rates, or concurred therein, and the resolution making such change was never communicated either to the general manager or any other· person authorized to act for the company.

6. ELECTRIC LIGHT COMPANIES—*Rates—Change of Rates—Revocation—Estoppel—Case at Bar.*—The franchise of an electric light company fixed the maximum rate which the company could charge for services. Later the company asked permission to change the rates at first fixed by it, and the council, by resolution, granted this request. The acquiescence of the city in this change of rates was not necessary, as the new rates were within the maximum. The city claimed that the company, by its adoption of the new rates under the resolution of the council, had ratified and approved the resolution as an amendment of its franchise fixing the rates it would be permitted to charge.

*Held:* That, as the new rates were within the maximum permitted by its original franchise, the conduct of the company was not inconsistent with its claim to be conducting its business by virtue of its original franchise.

Error to a judgment of the Circuit Court of Pulaski county in a proceeding for a mandamus. Judgment for petitioner for mandamus. Respondent assigns error.

*Reversed.*

The opinion states the case.

*Robert E. Scott,* for the plaintiff in error.

*H. C. Gilmer,* for the defendant in error.

PRENTIS, J., delivered the opinion of the court.

The essential facts out of which this controversy arises are these: On March 18, 1911, the council of the town of Pulaski granted a franchise to the Appalachian Power Company, whereby the power company, a public service corporation, entered into a contract to furnish electric light and power to consumers in the town, upon conditions expressed in the ordinance. The only clause of the franchise here involved is section 7 which reads thus:

"The meter rates charged by the..........., its successors or assigns, for domestic and commercial lighting shall not exceed ten (10) cents per kilowatt hour, and the rates charged for power shall not exceed the rates charged in other places by said..............., its successors or assigns for similar service under like conditions as to cost of supply."

On August 12, 1911, the council received by mail the paper signed in type "Appalachian Power Company," which is embodied in the ordinance of August 15, 1911, reading thus:

"Pulaski, Va., August 15, 1911.

"Council met in special meeting this 15th day of August, 1911, at 4 p. m. Present: John T. Loving, mayor and councilman, Dr. G. G. Painter, John W. Eckman, Robert Bunts, J. H. Ratcliffe, J. W. Holmes and J. Smith. The meeting was called to order by the mayor, who explained that it was called for the purpose of receiving and considering a new schedule of rates for supplying the light consumers of the town with electric current, offered by the Appalachian Power Company, submitted August 12, 1911, which read as follows, to-wit:

"To the Honorable Mayor and Council, Town of Pulaski, Va.

"The Appalachian Power Company respectfully requests you to grant them permission to change the rates for lighting as specified in their franchise, substituting therefor the following:

"Schedule for Lighting Rates.

"First 15 KWH at 10 cents each.

"Next 85 KWH at 8 cents each.

"All over 100 KWH at 6 cents each.

"5 per cent discount allowed for payment on or before the tenth of month in which bills are issued.

"This request is made for the following reasons. There appears at present to be some misunderstanding as to how the rate now in effect should be figured. When the sliding scale rate is used it is contended that the rate is slightly in advance over the former one and when the overlapping method is used an extreme unfairness results, as a consumer using 99 KWH pays considerably more than one consuming 101 KWH.

"Furthermore, the Appalachian Power Company desires to put in effect similar rates throughout all its properties, and this proposed rate is one already in use at Bluefield and several of the other plants.

"With the new rate in effect a fairer charge may be made to all consumers and a slight reduction will result in the majority of the bills.

"Respectfully,
"APPALACHIAN POWER COMPANY.

"After duly considering the proposition as set forth by the Appalachian Power Company it was moved and seconded and unanimously carried that the old rate for furnishing electric current to town consumers as agreed upon

by council and said company be rescinded, and that the schedules presented by said company as of August 15, 1911, be adopted instead as set forth by them and made a part of this record to govern future charges by said company for electric lights."

Thereafter the rates therein named were made effective, and so continued until the company, on August 12, 1919, filed its schedule of higher rates to become effective September 15, 1919.  This schedule reads thus:

"The State Corporation Commission of Virginia:
"Appalachian Power Company.
"Residence and Commercial Lighting Rate.
"Schedule B-6.
"Applicable to all consumers served in the State of Virginia.
"Rate:
"First 50 KWH per month at 10 cents per KWH
"Next 250 KWH per month at 8 cents per KWH
"Next 300 KWH per month at 7 cents per KWH
"All over 600 KWH per month at 6 cents per KWH
"Minimum charge seventy-five (75) cents per month.
"Discount of 5 per cent bills are paid on or before the 10th of the month following that in which service is rendered.
"Re-connection charge, one dollar ($1.00).
                    "APPALACHIAN POWER COMPANY.
                        "By R. E. SCOTT, Attorney."

The town thereupon filed its petition for mandamus against the company, claiming that by virtue of the action of the council on August 15, 1911, in response to the request for permission to change the rate authorized by section 7 of the original ordinance, that section of the original ordinance had been rescinded and that the rates fixed on August

15, 1911, controlled the company and constituted the contract rates under the franchise which could not be exceeded. The petition prayed for a mandamus requiring the company to observe these rates.

The answer of the company, on the other hand, claimed that section 7 of the original ordinance had never been amended, and that by authority of that franchise the company had full power to charge reasonable lighting rates to consumers in the town of Pulaski within the limits fixed by the original ordinance—that is, not in excess of ten cents per kilowatt hour; that if the action of the council on August 11, 1911, was intended by the council to operate as a rescission of section 7 and as an amendment of the original franchise, that such a result had never been intended or contemplated by the company, and that the ordinance of 1911 so relied upon by the town had never been communicated to the company or accepted by it as an amendment of the franchise, and that no one had ever been authorized by it to propose any amendment of the original franchise.

At the meeting in August, 1911, G. C. Wilder, then district manager of the Appalachian Power Company in the district of which the town of Pulaski formed a part, appeared and requested action on the communication referred to.    Wilder was succeeded as district manager two days later by one R. L. Pierce, on August 17, 1911, who was then told by Wilder that he had attended a council meeting on August 15, and shown the communication which he said he had written to the mayor and the town council on August 12, asking permission to change the rates for lighting, and that the council had given their permission for the change. At this time one M. Kahn was the general manager of the company, and H. M. Byllesby & Co., of Chicago, acting under the control of the board of directors, were in the charge of the company.   On August 22, 1911, Kahn, the

general manager, reported to Byllesby & Co., which report, so far as is pertinent, reads thus:

"Mr. Arthur S. Huey, Vice-President,
  "H. M. Byllesby & Company, Chicago, Ill.

"Dear Sir:
  "I herewith submit a report of our operations for the week ending Friday, August 18th, 1911.

### *"Matters of Interest.*

"We have taken up with the mayor and the city council the matter of changing the Pulaski lighting rates to our Bluefield rates which we have adopted as standard throughout this district, and the mayor and city council have agreed to same. The Pulaski franchise can remain undisturbed for it merely recites that the maximum rate chargeable shall be ten cents per K. W. H. and under this schedule our maximum rate is ten cents, with a five per cent discount."

The case was submitted upon an agreed statement showing what the testimony of the witnesses would be, and among the uncontradicted statements are these: That the business of the power company was, in 1911, conducted by M. Kahn, general manager, and G. C. Wilder, district manager, that Wilder was under the control of the general manager, who in turn was under the control of H. M. Byllesby & Co., of Chicago, acting under the control of the board of directors; that the manager of H. M. Byllesby & Co. and other officers of the company had no knowledge of the communication of August 12, 1911; that the ordinance of August 15, 1911, of the town of Pulaski, was never communicated to the other officers of the company; that its existence was unknown to them; and that no authority was ever con-

ferred upon any agent of the company to apply for or to accept any amendment to the franchise.

The trial court granted the prayer of the petition and awarded the mandamus prohibiting the proposed increases in the rates, and a writ of error has been allowed to that order.

[1-2] The question presented by these facts is a very narrow one. It is, in fact, freely conceded that unless section 7 of the original ordinance has been amended by the resolution of August 15, 1911, then the company is within its rights in making the proposed increase of 1919 effective. It cannot be fairly doubted, we think, that the municipal authorities and the company could, by agreement, amend the ordinance and reduce the maximum rate thereby authorized, and no further or additional consideration to the company would be needed to support such an amendment other than the continuing privilege during the term of the ordinance to conduct its business thereunder. We have, however, a statute (Code 1919, section 3022), which it would be necessary to pursue if it were proposed to increase the rates authorized by such a franchise, but this statute would not preclude a decrease of such rates by mutual agreement.

No sufficient reason appears for the request which was filed by Wilder for leave to establish the rates named in the application of August 12, 1911. It is perfectly manifest that the company had the right to make them effective without the consent of the town, for they were well within the maximum rate expressly authorized by section 7 of the original franchise. That the maximum rate authorized by the franchise was not either the rate then charged or referred to, is perfectly apparent from the document, which contains this language: "This request is made for the following reasons. There appears at present to be some misunderstanding as to how the rate now in effect should be figured. When the sliding scale rate is used it is contended

that the rate is slightly in advance over the former one and when the overlapping method is used an extreme unfairness results, as a consumer using 99 KWH pays considerably more than one consuming 101 KWH." The language just quoted is inapplicable, untrue and meaningless if the company at that time had in effect a flat ten-cent rate per kilowatt hour. It is hence clearly inferable thereform that on August 12, 1911, the company had in effect a varying scale of lighting rates within the maximum authorized by the franchise, and did not have in effect a flat rate of ten cents per kilowatt hour, because manifestly if such a flat rate had been then in effect, there could have been no misunderstanding as to how the rate should be figured, nor could there have been any question as to a sliding scale rate, or a calculation of rates by the "overlapping method; nor could there have been any extreme unfairness existing between a customer who used 99 KWH and one who used 101 KWH. This consideration leads us to the suggestion at least, that what was intended by that application was to change the sliding scale rates which were then being charged, and that it was not thereby intended to affect the maximum rate authorized by the franchise which had been agreed to within the six months previous. It is not in accord with the customs of business that either the company or the municipal authorities would, without legal advice, have taken action intended thus radically to modify or rescind section 7 of the franchise so recently adopted, and if acting upon legal advice it is inconceivable to us that the action taken would have been so informal in its character and so doubtful in its import. We cannot readily credit the view that the municipal authorities would have accepted a typewritten signature of the company from the district manager as an application to modify and change the franchise, without any communication whatever with either the

general manager at Bluefield, or with the officials or the agents in control of the company at Chicago.

All this is fully recognized by the learned counsel for the town, and to overcome the significance of these circumstances, he rests his argument largely upon the letter of M. Kahn, general manager at Bluefield, to Byllesby & Co., at Chicago, of August 17, 1911, hereinbefore quoted, and he argues that this shows that both Kahn, the general manager, and Byllesby & Co., were thereby notified of the proceedings in the city council, and should be charged with notice of the contents of the resolution of the council of August 15, 1911, although the letter makes no reference to any resolution. Its language is that "We have taken up with the mayor and city council the matter of changing the Pulaski lighting rates to our Bluefield rates, which we have adopted as standard throughout this district, and the mayor and city council have agreed to same." Inasmuch as under section 7 of the original franchise the company had the clear right to make its Pulaski rates conform to the Bluefield rates so long as they did not exceed the maximum fixed by the franchise, there is nothing in this language which can be fairly construed as notice that any proposition had been by anybody made to rescind section 7 of the franchise. The succeeding sentence in the letter makes it absolutely certain that neither Kahn, the general manager at Bluefield, nor Byllesby & Co., at Chicago, had the slightest intimation of such a proposed rescission or any intention to consent thereto, for it reads thus: "The Pulaski franchise can remain undisturbed, for it merely recites that the maximum rate chargeable shall be ten cents per KWH, and under this schedule our maximum rate is ten cents, with a five per cent discount."

[3-5] The crucial inquiry in the case is whether or not section 7 of the franchise has been rescinded and the rates named in the communication of August 12, 1911, substituted therefor. This being claimed by the town, the burden is

upon it to show that the franchise contract has thus been amended. Like other contracts a franchise of this character cannot be amended without the consent of both contracting parties. Whatever the intent of the city council by its resolution of August 15, 1911, that intent cannot operate to amend the contract except by agreement with the company. There is no evidence in the record in conflict with that which we have recited to show that the minds of the contracting parties ever met upon this alleged amendment, or concurred therein, and the resolution was never communicated either to the general manager or any other person authorized to act for the company.

[6] It is claimed, however, that the company should be held to have ratified and approved the amendment of its franchise, because from 1911 to 1919 it has charged and accepted the rates fixed by the resolution of the council of August 15, 1911. Of course there can be no doubt about the fact that a company may estop itself by its conduct from making a claim which is inconsistent therewith, and it is unnecessary to cite pertinent cases. There has, however, been no conduct of the company here which is inconsistent with its claim to be conducting its business in the town of Pulaski by virtue of its original franchise. The rates charged since August, 1912, as well as the proposed increases therein specified in the schedule which was filed in 1919, are both well within the maximum limit fixed by the original franchise. There is nothing requiring explanation in the conduct of the company, acting upon the letter of August 22, 1911, when it is so apparent that the general manager at Bluefield then understood and wrote to Byllesby & Co. that the Pulaski franchise would remain undisturbed. That letter as well as every subsequent act of the company shown by this record is entirely consistent with its present claim here, namely, that none of its officials ever had any

authority to consent to any modification of that franchise, and that none of them has ever so consented. There is evidence that the new proposed rates correspond with the rates for lighting elsewhere, and that the old rates had not yielded a rate sufficient to pay fixed charges of the company, and that the rates complained of are less than the service is fairly and reasonably worth, as well as less than fair, just and adequate. These questions, however, are referred to in the record only in general terms. The town is claiming that the company is bound by its franchise contract not to increase the rates referred to in the resolution of August 15, 1911, whether the rates be adequate or inadequate, and as to this, the chief and main contention, we are clearly of opinion that the trial court erred in its judgment. Our conclusion is that section 7 of the original contract authorizing a maximum lighting rate of ten cents per kilowatt hour is still in effect and has never been amended or rescinded in the only possible way in which such amendment or rescission can be accomplished—that is, by the mutual agreement of the municipal authorities with the company.

For the reasons indicated, the order will be reversed, and the petition for mandamus dismissed.

*Reversed.*